IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | |
| ) | Crim. No. 19-CR-361 (BAH) |
| JAMES HUTCHINGS, ) | |
| ) | |
| Defendant. ) | |

**DEFENDANT JAMES HUTCHINGS'S MOTION TO SUPPRESS EVIDENCE**

Modern cell phones contain "a digital record of nearly every aspect of their [owners'] lives—from the mundane to the intimate." *Riley v. California*, 573 U.S. 373, 395 (2014). Hoping for an unfiltered view into the life of Defendant James Hutchings, federal agents seized his phone and, knowing that the phone was likely his, misled a magistrate into authorizing a search warrant for its contents. Because the government lacked probable cause for both the search and seizure of Hutchings's phone, and misled a judicial officer to find otherwise, both the phone and the fruits of its digital contents must be suppressed.

**FACTUAL BACKGROUND**

In December 2018, federal agents executed a search warrant at the residence of Linwood Thorne in Northeast Washington, D.C. After finding evidence that he was illegally selling guns, Thorne was indicted and a warrant was issued for his arrest. On January 3, 2019, officers were conducting surveillance of Thorne's suspected location near a row of apartments on Linden Avenue in Baltimore, Maryland. Ex. 1 (Thorne Arrest Report). Officers observed Hutchings and another person leaving one of the apartments. When they started to drive off, agents pulled them over, handcuffed Hutchings and his friend, and questioned them without reading them their *Miranda* rights. *Id.* at 2. Through their questions, agents learned that Thorne was alone in

1

apartment number 2. *Id*. Hutchings was not detained because, as the government noted in its Detention Memorandum, "[a]t the time, the defendant had not done anything wrong, so agents had no reason to detain the defendant." Gov't Det. Mem. [Dkt. 6] at 9.

After learning which apartment was Thorne's, agents entered it and arrested him. They searched the location and recovered four telephones. Ex. 2 (Jan. 4, 2019 FBI-302). Three phones were identifiably Thorne's: one was on his person, while two were in a pile of clothes Thorne identified as belonging to him. *Id*. The fourth phone, which belonged to Hutchings, was on a kitchen counter far from Thorne's reach. *Id*. At the time that agents seized Hutchings's phone, it prominently displayed a picture of Hutchings and his family:



*Ex. 3:* Photograph of Hutchings's Phone

2

Even though the phone visibly belonged to Hutchings, not Thorne, Agent Richard Migliara submitted an affidavit for a warrant to search it.  Ex. 4.  The affidavit included the exact model number and international mobile equipment identity ("IMEI") number for each phone, which would have required agents to closely study and manipulate the phones. Id. at 17 ("Attachment A").  Yet, although agents spoke with Hutchings outside of Thorne's apartment (and thus knew what he looked like), and although the phone prominently displayed Hutchings and his family, the affidavit misleadingly portrayed Hutchings's phone as belonging to Thorne.

It did this both affirmatively and through material omissions.  First, the affidavit falsely stated that all four phones were "associated with LINWOOD DOUGLAS THORNE." *Id*. at 3–4, ¶ 5.  There was no evidence supporting that declaration.  Second, the affidavit omitted three pieces of information indicating that the phone belonged to Hutchings, not Thorne, and that Hutchings likely had simply forgotten his phone after visiting Thorne: (1) The agents had just seen Hutchings leaving Thorne's apartment; (2)  the phone was found in an separate location from Thorne's other phones, which were either on his person or in his clothes; and, most importantly, (3) the phone's lock screen had a photo of Hutchings and his family.[1]

Under the impression that the phone belonged to Thorne rather than Hutchings—the latter of whom "had not done anything wrong"—the magistrate issued a search warrant for all four

---

[1] The wording in a subsequent affidavit strongly suggests that agents understood that the phone belonged to Hutchings *before* they obtained the warrant, as anyone looking at the phone would surmise:

> Pursuant to a search warrant, agents had obtained access to one of the phones found near Linwood Thome during his arrest on January 3, 2019. *That phone was believed to belong to a HUTCHINGS*, an individual stopped right outside of Thorne's arrest location in Baltimore, Maryland. *Once downloaded*, the phone had an IMEI of 353790083559665 and IMEI variation of 310410106234558.

Ex. 5 (emphasis added).  As noted above, agents "downloaded" the phone's IMEI identification number *before* applying for the search warrant. Ex. 4 at 17.

3

phones, including the phone belonging to Hutchings.  After searching Hutchings's phone, the government used its treasure trove of personal information to make its case against him.  *See* Gov't Det. Memo. [Dkt. 6] at 9 (describing the fruits of the search and how the government used them). And with that information, the government then obtained a warrant to search Hutchings's home and to seize and search several other phones belonging to him and his family.

## ARGUMENT

Both the phone and its fruits must be suppressed for three independent reasons. First, the initial stop and seizure of Hutchings—through which federal agents learned that Thorne was in the apartment—was illegal.  Second, even if it were proper, the agents lacked probable cause to seize Hutchings's phone from the apartment.  Third, even if agents were permitted to seize his phone, they lacked probable cause to search it, and the affidavit through which the agents received a warrant to search the phone misrepresented that the phone belonged to Thorne.

### I. Agents Learned of the Location of Hutchings's Phone Through an Illegally-Extended Stop

Although many of the government's investigatory and litigation documents suggest that agents approached Hutchings and his friend as they were walking outside of Thorne's apartment, *see, e.g.*, *id*., the arrest report confirms that agents pulled Hutchings over as he and his friend drove away from Thorne's apartment. Ex. 1.  Agents approached the pair with guns drawn, ordered them out of their vehicle, placed them into handcuffs, and questioned them without *Miranda* warnings. During this stop, agents learned of Thorne's exact apartment number and then entered his apartment and arrested him.  *Id*.  After this arrest, agents seized Hutchings's phone.

"When the government conducts an unconstitutional search or seizure, the Court must exclude any evidence obtained as the 'fruit' of that search or seizure." *United States v. Smith*, 373 F. Supp. 3d 223, 236 (D.D.C. 2019) (internal quotation marks omitted).  A seizure occurs as a

4

result of a "show of authority," when "a reasonable person would not have believed he was free to leave." *United States v. Gibson*, 366 F. Supp. 3d 14, 28 (D.D.C. 2018). Even if probable cause is not required, an officer must still have "reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). And in those circumstances, the stop must end once there is no reasonable basis for continued suspicion. *See Rodriguez v. United States*, 575 U.S. 348, 354 (2015).

Here, there was no justification to stop and detain Hutchings. There was no evidence suggesting he had broken any laws, as the government later acknowledged. Gov't Det. Mem. at [Dkt. 6] at 9 ("At the time, [Hutchings] had not done anything wrong, so agents had no reason to detain the defendant."). Indeed, the omission of the traffic stop from later descriptions of Thorne's arrest suggests the government's recognition that the stop was improper.

The only possible justification for the stop was that agents believed Hutchings was Thorne, given the government's claim that "Thorne and the defendant look similar." *Id*. at 4 n.2; *see also* Ex. 1 at 1 (stating that Hutchings "was similar in physical appearance (height, weight, hair style) to THORNE"). Even if that were the case, however, the stop should not have continued any longer than necessary to confirm Hutchings's identity. *See Rodriguez*, 575 U.S. at 354 ("Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."). Instead, agents handcuffed Hutchings and subjected him and his friend to *Miranda*-less questioning; through this illegal seizure and questioning, they then learned the specific apartment Thorne was in and then entered the apartment and seized Hutchings's phone. Ex. 1. Thus, the seizure of this phone was the illegal fruit of a warrantless seizure and questioning, and must be suppressed. *See Smith*, 373 F. Supp. 3d at 236; *cf. United States v. Hood*, No. 19-CR-

315 (ESH), 2020 WL 353859, at *3 (D.D.C. Jan. 21, 2020) (suppressing gun seen in defendant's waistband after improper *Terry* stop).

## II.     Agents Seized Hutchings's Phone Without Probable Cause

Even if the stop and extended questioning of Hutchings were lawful, the seizure of Hutchings's phone from Thorne's apartment was not. After they arrested Thorne, federal agents were entitled to conduct a search incident to arrest and seize any recognizable evidence on Thorne's person or within his reach. *Arizona v. Gant*, 556 U.S. 332, 339 (2009) (following a lawful arrest, officers may search "the arrestee's person and the area within his immediate control"); *cf. Riley*, 573 U.S. at 388 (noting parties' concession that after a search incident to arrest, "officers could have seized and secured [the arrestees'] cell phones [from their person] to prevent destruction of evidence while seeking a warrant"). But Hutchings's phone was neither on Thorne's person nor within his reach. It was in a different room, laying on a kitchen counter, and it was seized after a warrantless sweep of Thorne's apartment for electronic devices.

Nor was there probable cause for the seizure: The photo on the phone's lock screen made clear that it belonged to Hutchings, whom the officers had just questioned and whom they knew had just left the apartment. And at the time, as the government stated, Hutchings "had not done anything wrong [and] agents had no reason to detain the defendant." Dkt. 6 at 9. Thus, there was no basis for the warrantless seizure of Hutchings' phone, and the Court should suppress it and any evidence derived from its contents. *Smith*, 373 F. Supp. 3d at 236.[3]

---

[3] The search of Thorne's apartment for electronic devices violated the privacy interests of his social guests, who would have an expectation of privacy in items accidentally left behind—especially their phones. Hutchings thus has standing to object to the warrantless corralling of all electronic devices in the apartment. Regardless, Hutchings obviously has standing to object to the seizure of his own phone without probable cause.

### III. Agents Searched Hutchings' Phone Without Probable Cause After Misleading the Magistrate to Believe Hutchings's Phone Belonged to Thorne

Finally, even if the agents had seized the phone lawfully, they lacked probable cause to search its contents, and the search warrant to do so was tainted by Agent Magliara's misleading affidavit.

The Fourth Amendment constrains what officers may allege in applying for a search warrant. When a defendant can make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978). This rule applies equally to material omissions. *United States v. Spencer*, 530 F.3d 1003, 1007 (D.C. Cir. 2008). And if a defendant establishes (by a preponderance of the evidence) that the affidavit suffered from perjury, reckless disregard of the truth, or a material omission, the fruits of the search must excluded if the remaining affidavit— with improper material removed and material omissions added—is insufficient to establish probable cause. *See Franks*, 438 U.S. at 156.

In this case, by the time agents downloaded his phone's IMEI, the "phone was believed to belong to a HUTCHINGS, an individual stopped right outside of Thorne's arrest location in Baltimore, Maryland." Ex. 5. Since the IMEI was included in the affidavit for a warrant to search the phone, Agent Migliara appears to have been intentionally dissembling when he falsely wrote that all four phones seized from Thorne's apartment were "associated with LINWOOD DOUGLAS THORNE." Ex. 4, ¶ 5.

Even if he did not know that the phone belonged to Hutchings, at best the affidavit recklessly disregarded the truth. No information supported the blanket assertion that the phone

7

"was associated with" Thorne.  And several facts suggested that the phone belonged to Hutchings, including: (1) when inspecting the phone to find its model number and IMEI, agents saw the lock-screen photo of Hutchings and his family; (2) having just questioned him outside Thorne's apartment, agents knew what Hutchings looked like; and (3) agents knew that Hutchings had just left Thorne's apartment and thus may well have forgotten his personal phone.  At a minimum, these facts were material and should not have been hidden from the magistrate.

If federal agents are permitted to omit such material facts about ownership (or lack thereof), the government could, in practice, get a warrant to search any phone owned by someone living with or visiting a criminal.  Such an outcome would vitiate privacy concerns and evade the specificity requirement recently emphasized in *United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017).  In *Griffith*, the court suppressed evidence obtained from a search warrant authorizing police to seize "all electronic devices to include but not limited to cellular telephone(s), computer(s), electronic tablet(s), devices capable of storing digital images (to include, but not limited to, PDAs, CDs, DVD's [and] jump/zip drives)."  *Id*.  The court noted that this language "did not stop with any devices owned by [the defendant], which already would have gone too far. It broadly authorized seizure of *all* cell phones and electronic devices, without regard to ownership.  That expansive sweep far outstripped the police's proffered justification for entering the home—viz., to recover any devices owned by [the defendant]."  *Id*. (emphasis in original). Here, the government essentially achieved the same improper result.  Agents seized the phones first, then sought a warrant by claiming vaguely that all of the phones were "associated with" a suspect—while omitting evidence that one of those phones belonged to someone else.

Finally, the hypothetical revised affidavit—with misrepresentations excised and material omissions included—would not have established probable cause.  The affidavit has plenty of

information suggesting that Thorne sold arms and drugs, but has no information linking Hutchings to any of Thorne's activity. Indeed, it doesn't mention Hutchings at all. That is not surprising, since as the government has stated, "[a]t the time, [Hutchings] had not done anything wrong, so agents had no reason to detain the defendant."

In sum, the Court must suppress any evidence derived directly or ultimately from the search of Hutchings's phone. This includes evidence obtained from subsequent search warrants based on the contents of the phone, or testimony from witnesses discovered using evidence from that phone. *Smith*, 373 F. Supp. 3d at 236.

## CONCLUSION

For these reasons, Hutchings respectfully requests that the Court exclude evidence obtained from the illegal seizure and search of his cell phone, and any evidence derived from that search.

Dated: April 20, 2020

Respectfully submitted,

_____
Matthew J. Peed (DC Bar No. 503328)
matt@clintonpeed.com
**CLINTON & PEED**
777 Sixth St. NW, 11th Floor
Washington, DC  20001
Tel: (202) 621-1828

*Attorney for James Hutchings, Jr.*